**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**September 6, 2023**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP395**

STATE OF WISCONSIN

Cir. Ct. No. 2010CI2

IN COURT OF APPEALS
DISTRICT I

IN RE THE COMMITMENT OF DONALD SAMUEL JAMES:


STATE OF WISCONSIN,

PETITIONER-RESPONDENT,

V.

DONALD SAMUEL JAMES,

RESPONDENT-APPELLANT.


APPEAL from an order of the circuit court for Milwaukee County: GLENN H. YAMAHIRO, Judge. *Affirmed*.

Before White, C.J., Donald, P.J., and Dugan, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Donald Samuel James was committed under WIS. STAT. ch. 980 (2021-22),[1] as a sexually violent person. The instant appeal concerns James' petition for discharge from his commitment and the circuit court's order denying James' petition, without a hearing. On appeal, James argues that he is entitled to a hearing on his petition for discharge based on two recent expert reports from which a jury would likely conclude that he is no longer a proper subject for commitment. We disagree, and thus, we affirm the circuit court's order denying his petition for discharge, without a hearing.

## BACKGROUND

¶2 James was convicted in 1986 in Milwaukee County Circuit Court Case No. 1986CF5679 of second-degree sexual assault, and then in 1990 in Milwaukee County Circuit Court Case No. 1990CF900750, he was convicted of first-degree sexual assault and on November 29, 1990, he was sentenced to the Wisconsin State Prison for twenty years.[2] In July 2003, he was released on probation. However, he returned to custody in December 2003, after his probation was revoked following an allegation from his girlfriend that he sexually assaulted her. James was never charged in response to his girlfriend's allegation, and, in fact, she later recanted her allegation.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] An additional count of second-degree sexual assault was dismissed and read in for purposes of sentencing in Case No. 1986CF5679. Similarly, two additional counts of first-degree sexual assault and a count of armed robbery were dismissed and read in for purposes of sentencing in Case No. 1990CF900750.

¶3      The Wisconsin Department of Corrections (DOC) calculated that James' mandatory release date from prison was July 26, 2010, and DOC anticipated that he would be released from prison on that date.  On July 23, 2010, the State petitioned to have James committed as a sexually violent person under WIS. STAT. ch. 980.  The circuit court found probable cause to have James committed, and he was transferred from DOC's custody to Sand Ridge Secure Treatment Center.[3]

¶4      Following numerous delays, the case proceeded to a jury trial in 2018.[4]  At trial, the State presented the opinions of Dr. Anthony Jurek and Dr. Melissa Westendorf.  Dr. Jurek testified that James was diagnosed with paraphilia not otherwise specified and antisocial personality disorder with borderline and narcissistic features, and Dr. Westendorf added a provisional diagnosis of sexual sadism.  They further testified about James' resistance to treatment while at Sand Ridge and James' inability to progress past Phase Two of his treatment.  Dr. Jurek and Dr. Westendorf also both testified that they were of the opinion that James was more likely than not to reoffend and that James met the criteria for commitment.  James' expert, Dr. Richard Elwood, testified that he disagreed that James was more likely than not to reoffend and concluded that

---

[3] Sand Ridge Secure Treatment Center is one of two secure treatment centers operated by the Division of Care and Treatment Services.  Established in 2001, it houses Wisconsin's Sexually Violent Persons Program.

[4] Several of the adjournments were due to the withdrawal of James' counsel. Consequently, by the time of the trial, James was *pro se*, and he represented himself at trial with the assistance of standby counsel.  We note that even James' standby counsel at the time of trial was not the first standby counsel appointed to James' case.

James' score did not exceed 50% "by a credible margin of error."[5]   Thus, Dr. Elwood was of the opinion that James did not meet the criteria for commitment.   In the end, the jury found James was a proper subject for commitment as a sexually violent person, and James remained at Sand Ridge.

¶5     James filed a petition for discharge from his commitment on February 22, 2021, and he relied on the opinions of Dr. Sheila Fields and Dr. David Thornton that James no longer met the criteria for commitment as support for his petition.   Based on those opinions, he argued, "[T]here have been a number of significant changes such that a fact finder would likely conclude that he no longer meets the criteria for continued commitment."   The "[m]ost significant" of these changes was a polygraph examination where James tested "non-deceptive" when asked if he assaulted his girlfriend in 2003 and the "several years of additional treatment participation."   He also cited Dr. Fields' and Dr. Thornton's conclusions that James is no longer more likely than not to reoffend.

¶6     In particular, Dr. Fields prepared an annual re-examination report required under WIS. STAT. § 980.07.   As part of her report, she estimated James' likelihood of reoffending.   Using the Static-99R,[6] Dr. Fields rated James as a five, which she stated was "considered 'above average' risk compared to other sex

---

[5] More specifically, Dr. Elwood scored James using an actuarial instrument commonly used by experts in this area to assess the likelihood of recidivism over a specified period. Actuarial instruments of this type are "statistical research-based instruments that are created using data obtained by studying various factors associated with recidivism in groups of people who were convicted for sexual offenses, released, and followed over time." *State v. Combs*, 2006 WI App 137, ¶4, 295 Wis. 2d 457, 720 N.W.2d 684.

[6] The Static-99R is one type of actuarial instrument used to assess the likelihood of recidivism over a specified period.

4

offenders."[7] She further assessed James on the VRS-SO scale,[8] and she explained three things: (1) James' "psychological and sexual[] functioning has been similar to that found in typical persons in higher-risk samples"; (2) "[t]reatment related changes in functioning since being placed at Sand Ridge have been minimal"; and (3) 37% of those with the same score "will be apprehended for another sex crime within ten years."

¶7     In evaluating James more specifically, Dr. Fields came to the conclusion that "James' lifetime probability of being apprehended for another sex crime is most likely about five percentage points higher than his 37% ten-year estimate," and James' "'real' lifetime risk of reoffending, whether or not he is ever apprehended again is most likely around 48%." She acknowledged that in her report from the previous year, she concluded that James' risk "was slightly above 50%"; however, she stated, "The marginally lower figure this year does not reflect favorable changes in his function that might truly lower risks." She continued, "Rather, it is solely an artifact of technical changes in ways to calculate the statistical effects on risks due to possibilities of undetected new crimes." She described:

> Obviously, there is only a trivial difference between sexual reoffending estimates of 48% vs a few percentage points higher, especially given the inherent imprecisions of any such projections. It is probably most accurate to conclude that Mr. James' sexual reoffending likelihood is close to the 50+% thresholds statutorily necessary for continued commitment, but at least if not more likely to be a little under than over 50%.

---

[7] Dr. Jurek and Dr. Westendorf similarly scored James as a five at the time of James' trial. Dr. Elwood, however, scored James as a four.

[8] Dr. Fields explains in her report that VRS-SO stands for Violence Risk Scale-Sex Offenses.

¶8    Ultimately, Dr. Fields concluded:

> It is my opinion to a reasonable degree of professional certainty that Mr. James is not yet adequately demonstrating significant progress in treatment as defined by statute and supervised release is therefore not warranted at this point.
>
> However, Mr. James' probability of committing further acts of sexual violence, detected or not, does not clearly exceed 50%. As such, I believe to a reasonable degree of professional certainty that he is not a sexually violent person as defined by Wisconsin statutes.

¶9    Dr. Thornton also prepared a report for James in connection with the petition for discharge as a court-appointed examiner under WIS. STAT. § 980.031. Dr. Thornton diagnosed James with other specified disruptive, impulse-control, and conduct disorder and other Specified paraphilic disorder, and he stated, "These disorders combined to predispose him to acts of sexual violence. Their intensity, however, has likely waned as he has aged." Dr. Thornton proceeded to evaluate James using the Static-99R, SRA-FV, and Risk Matrix 2000.[9] Based on the scores, and adjusting for the risk of undetected offending, Dr. Thornton provided a "final risk estimate" of 43%. Dr. Thornton explained that James "would have been assigned … a much higher level of risk" but "aging has diminished his risk to a material degree."

¶10    The State responded by highlighting the most recent treatment progress report prepared by Dr. Amelia Fystrom. In her report, Dr. Fystrom noted that James has had "mixed success with maintaining meaningful participation" in

---

[9] The SRA-FV (Structured Risk Assessment-Forensic Version) and the Risk Matrix 2000 are actuarial instruments similar to the Static-99R that are used to assess the likelihood of reoffense.

his treatment and that James "was very focused on completing 'check-list' items to progress through the treatment program, but struggled with being able to apply what he had learned." She further described a general unwillingness and reluctance, in some cases even resistance, on James' part to participate in treatment. In fact, Dr. Fystrom reported:

> James has interacted with his treatment team in such a way that it seems he may be attempting to manipulate them. He is quick to come up with convenient excuses as to why he cannot do a treatment task. Mr. James continues to show elements of callousness and lack of empathy.

Overall, Dr. Fystrom concluded that James was not meeting the criteria and, therefore, "James is not making significant progress in treatment."

¶11 The circuit court denied James' petition for discharge, without a hearing. The circuit court recognized that "[i]n this case, of course we got two opinions … supporting [James'] position." However, as to Dr. Fields' report, the circuit court stated, "My concerns in this case begin with this is really one of the more equivocal determinations I have ever seen in these reports based on Dr. Fields' conclusions[.]" The circuit court went on to describe that Dr. Fields' assessment of James' risk of reoffending "are distinctions essentially without a difference" because Dr. Fields currently put James' risk of reoffending at around 48% but in last year's report, it was "slightly above" 50%. The circuit court found:

> It is certainly within the margin of error for any subjective analysis of whether someone is above or below a 50[%] likelihood of reoffending…. [I]t is certainly not a strong statement. You know, it really does not help the court for practitioners to make findings that someone is most likely around a percentage, slightly above. Because I think, as we all know, these tools are not that precise. That is why all of these other factors are taken into account in every case in trying to make determinations.

¶12     The circuit court addressed the polygraph examination saying that it was "new evidence," but the court continued that recantations are common in this area and "there is some weight" to be afforded to the administrative law judge who originally heard the accusations of James' girlfriend and found them credible. The circuit court further addressed James' treatment and noted that there was "a theme running through all of these assessments" and James was "someone who is trying to push their way through." Thus, the circuit court found:

> So what I see here is one strong opinion and one that is quite weak in Dr. Fields. While recognizing there is some new evidence here with regard to the polygraph and also with regard to some of the methodology that is available to the practitioners that was used in this case, based on all of those factors, I still don't find that [James] has met [his] burden here.

¶13     James now appeals.

## DISCUSSION

¶14     We review *de novo* the circuit court's decision to deny James' petition for discharge filed pursuant to WIS. STAT. § 980.09. *See **State v. Hager***, 2018 WI 40, ¶19, 381 Wis. 2d 74, 911 N.W.2d 17. To do so, we first turn to the language of § 980.09 that governs the review of a petition for discharge and the two-step process set forth in ***State v. Arends***, 2010 WI 46, 325 Wis. 2d 1, 784 N.W.2d 513.[10]

---

[10] We note that WIS. STAT. § 980.09 has been revised by 2013 Wis. Act 84 since our supreme court's decision in ***State v. Arends***, 2010 WI 46, 325 Wis. 2d 1, 784 N.W.2d 513. However, the two-step procedure remains intact. The primary difference is the change in the standard for assessing whether a petitioner is entitled to a discharge hearing, which changed from "court or jury may conclude" that the petitioner's condition has changed to "court or jury would likely conclude" that the petitioner's condition has changed. *See* 2013 Wis. Act 84, §§ 21, 23.

¶15 The statute governing petitions for discharge instructs:

> The court shall deny the petition under this section without a hearing unless the petition alleges facts from which the court or jury *would likely conclude the person's condition has changed* since the most recent order denying a petition for discharge after a hearing on the merits, or since the date of his or her initial commitment order if the person has never received a hearing on the merits of a discharge petition, so that the person no longer meets the criteria for commitment as a sexually violent person.

WIS. STAT. § 980.09(1) (emphasis added). This first step is "a limited review of the sufficiency of the petition" wherein the court looks at the sufficiency of the petition itself to determine if the petitioner is entitled to a discharge hearing. *See Arends*, 325 Wis. 2d 1, ¶30.

¶16 If the petition itself is sufficient, the court moves to the second step and looks beyond the petition to the record to determine if a discharge hearing is warranted. *See id.*, ¶¶4, 32, 43. Under the second step, "[i]n reviewing the petition, the court may hold a hearing to determine if the person's condition has sufficiently changed such that a court or jury would likely conclude the person no longer meets the criteria for commitment as a sexually violent person." WIS. STAT. § 980.09(2).

> [T]he court may consider the record, including evidence introduced at the initial commitment trial or the most recent trial on a petition for discharge, any current or past reports filed under s. 980.07, relevant facts in the petition and in the state's written response, arguments of counsel, and any supporting documentation provided by the person or the state.

*Id.*

¶17 The court shall deny the petition if it determines "that the record does not contain facts from which a court or jury would likely conclude that the

person no longer meets the criteria for commitment." ***Id.*** However, "[i]f the court determines that the record contains facts from which a court or jury would likely conclude the person no longer meets the criteria for commitment, the court shall set the matter for trial." ***Id.*** In conducting its review of the record, the court is not required to "take every document a party submits at face value" and "[t]he court's determination that a court or jury [would likely] conclude in the petitioner's favor must be based on facts upon which a trier of fact could reasonably rely." ***Arends***, 325 Wis. 2d 1, ¶39.

¶18 Lastly, the criteria for commitment referenced as part of the standard are: (1) the person has been convicted, found delinquent, or found not guilty by reason of mental disease or defect of a sexually violent offense; (2) the person has a mental disorder; and (3) the person "is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence." *See* WIS. STAT. §§ 980.01(7), 980.02(2); *see also* ***Arends***, 325 Wis. 2d 1, ¶15. In this case, the parties focus on the third criteria for commitment, namely James' likelihood to reoffend.

¶19 James argues on appeal that the circuit court erroneously denied his petition without a hearing. In support of his position, he argues that a court or a jury "would likely conclude" that his condition has sufficiently changed and he is no longer more likely than not to reoffend based on the two opinions provided by Dr. Fields and Dr. Thornton. He further argues that the circuit court erroneously weighed the evidence and held him to a higher burden of production than was required of him to obtain a trial for a petition for discharge.

¶20 The State argues that James takes a "myopic focus" and "ignores the rest of the record." Instead, the State argues that James is not entitled to a

discharge hearing simply because two doctors opined that the likelihood that James will reoffend is less than 50% but, rather, he is only entitled to a discharge hearing if a fact finder would likely conclude that his condition has sufficiently changed. With "the wealth of evidence in the record showing that James has made almost no progress" in treatment, the State argues that James fails to carry his burden.

¶21     We agree with the State, and we turn to the record to determine if it contains evidence from which a fact finder would likely conclude that James' condition has sufficiently changed such that a fact finder would now conclude that James no longer meets the criteria for commitment.

¶22     At James' trial in 2018, the jury heard three opinions about James' likelihood of reoffending. Dr. Jurek and Dr. Westendorf testified that James was more likely than not to reoffend. They based their opinions on actuarial instruments, such as the Static-99R, and their assessment of James' lack of progress and participation in the treatment provided to him at Sand Ridge. By contrast, Dr. Elwood testified that James was not more likely to reoffend; however, he explained at trial that this was based on the fact that James' score did not exceed 50% "by a credible margin of error." Indeed, Dr. Elwood assigned a 47% risk that James would reoffend. These opinions, which were already considered by the jury, are not dramatically different, or as the State says "meaningfully different," from those James currently provides from Dr. Fields and Dr. Thornton such that we can conclude that a new fact finder would likely conclude anything different from James' trial. *See State v. Schulpius*, 2012 WI App 134, ¶4, 345 Wis. 2d 351, 825 N.W.2d 311 (concluding that "the petitioner must also produce some new evidence, not previously considered by a trier of fact").

11

¶23     In order to succeed on a petition for discharge and obtain a hearing, James is required to show that a fact finder would likely conclude that his condition has sufficiently changed.  *See* WIS. STAT. § 980.09(1)-(2).  However, the jury was provided with nearly identical opinions at James' trial.  Ultimately, James makes too much out of the polygraph examination where he tested "non-deceptive" and the change in the science relied on by Dr. Fields when Dr. Fields' and Dr. Thornton's reports are carefully considered in their entirety and in light of the record.  As our supreme court has repeatedly stated, in order to obtain a discharge hearing, James must provide information upon which a fact finder could "reasonably rely" to conclude that James no longer meets the criteria for commitment.  *See Arends*, 325 Wis. 2d 1, ¶39.

¶24     Consequently, given the similarities in the opinions provided at James' trial to the opinions of Dr. Fields and Dr. Thornton, we conclude that James fails to show that, based on the record, his condition is sufficiently changed such that a new fact finder would likely conclude that he is no longer more likely than not to reoffend.  Indeed, Dr. Elwood provided nearly the exact same opinion as those currently provided by Dr. Fields and Dr. Thornton that James' risk of re-offense is just under the 50% threshold, and James' score on the Static-99R has also not changed.

¶25     James nevertheless argues that a change in the science concerning assessing his risk of reoffending can constitute a change entitling him to a discharge hearing.  *See State v. Ermers*, 2011 WI App 113, ¶1, 336 Wis. 2d 451, 802 N.W.2d 540 ("[T]he 'change' referred to in this sentence includes not only a change in the person himself or herself, but also a change in the professional knowledge and research[.]").  James' argument misses the point.  While Dr. Fields notes a change in the science behind the risk assessment changed her ultimate

conclusion from a previous report, we must still carefully consider Dr. Fields' report itself and consider her report in light of the entire record, including the evidence already presented to the jury at James' trial. Thus, we are unpersuaded by James' argument that the change in science noted by Dr. Fields in her report is enough for James to obtain a discharge hearing.

¶26 We are similarly unpersuaded by James' argument that the circuit court engaged in improper weighing of the evidence to reach its conclusion.[11] As plainly stated in the statute, we must consider the entire record, *see* WIS. STAT. § 980.09(2), and we must "consider" the evidence James now presents with the evidence previously presented and look for a change from the time of James' trial to the time of his current petition for discharge. *See Arends*, 325 Wis. 2d 1, ¶33; *see also Hager*, 381 Wis. 2d 74, ¶¶4, 30 (explaining that circuit courts are to "carefully examine" the record "which may include facts both favorable as well as unfavorable to the petitioner"). After careful consideration of the record, we conclude that James failed to present evidence from which a fact finder would likely conclude that his condition has sufficiently changed and he no longer meets the criteria for commitment.

**CONCLUSION**

¶27 We conclude that the circuit court properly denied James' petition for discharge from his commitment without a hearing. Considering the two opinions of Dr. Fields and Dr. Thornton, along with the remainder of the record,

---

[11] James relatedly argues that the circuit court may only deny a petition under this second step in four circumstances. *See Arends*, 325 Wis. 2d 1, ¶39. James mischaracterizes *Arends*. Rather, the court provided a non-exhaustive list of examples.

James has failed to produce evidence showing that a court or jury would likely conclude that James' condition has sufficiently changed and he is no longer more likely than not to reoffend.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.